[Civ. No. 6875. Third Dist. Nov. 30, 1942.]

Estate of CHARLES COMINO, Deceased. FRANK COMINO et al., Appellants, v. JULIA COMINO, Respondent.

Preston & Gibson for Appellants.

Frank W. Taft for Respondent.

ADAMS, P. J.—This is an appeal from an order and judgment admitting a will to probate.

The will in question was that of Charles Comino who died about noon on November 23, 1940. It was executed before noon on November 22nd, and devised all of his property to Julia Comino, his wife. Probate was opposed by Frank Comino, a brother, and Angela Graziano, a sister of decedent, both adults, on the ground that the testator was incompetent to make a will and that in the making of same he was unduly influenced by Julia Comino "and others."

It appears from the evidence that decedent and Julia Comino were married on January 14, 1932, and lived together as husband and wife until the death of Charles Comino. It developed however, when Julia Comino petitioned to have a probate homestead set apart to her, that her divorce from a former husband had not become final at the time of her marriage to Comino, though neither of the parties was aware of this fact during the lifetime of Comino.

Prior to their marriage Julia had a small store in Ukiah, and some money in the bank. Charles lived on his ranch near Ukiah. After the marriage she changed her bank account to a joint one, and in 1933 Comino made a will in her

favor, and the two executed and recorded a homestead on the ranch property. Later Julia opened a restaurant in Ukiah, which she operated until 1935, when she sold it, using the money received for it to pay existing bills and to purchase ranch supplies. She resided upon the ranch until 1936 but as it was not profitable she went to San Francisco and secured employment as a cook. Later in the year she opened a restaurant there. This she subsequently sold, and returned for a time to the ranch. In 1937 she again went to San Francisco and acquired a lease on the Graystone Hotel which she was still operating at the time of Comino's death.

During all the time that she was absent from the ranch she and Comino visited one another, and letters exchanged between them showed his affection for her and his reliance upon her for financial support, which she gave from time to time. In 1938 Comino became ill and was in a sanitarium for treatment. Julia visited him there and helped pay his expenses. His health gradually failed thereafter. Julia was subsequently ill in a San Francisco hospital, but she did not let Charles know this. They however continued to visit one another and Julia sent money to Charles between January, 1939, and July, 1940, amounting to over $300.

Contestants rely upon testimony given by them and by others testifying in their behalf, that from about 1938 on Comino had complained about Julia and had said he was going to get a divorce; and that when he entered the hospital that he had said he was not going to tell Julia because she had not told him that she had gone to a hospital. They also gave testimony to the effect that during the latter part of October, 1940, decedent had told his sister, Rosie Valeri, that he had not "fixed things up," and that he thought his relatives would get everything; and that thereupon Rosie had had a will prepared for him, leaving all his property to his brothers and sisters, and making no mention of his wife. This will Comino executed in the hospital in San Francisco on October 31, 1940. But it was subsequently discovered that this will was ineffectual because of the homestead on the property, whereupon an attempt was made to secure a deed from Comino and Julia; but it was then too late. Opposed to the testimony of contestants as to the state of Comino's feelings toward Julia, there was testimony that about November 1, 1940, he asked his doctor to send for his wife, this being the first knowledge she had that he was in the hospital; that she

thereafter visited him every day, and that to friends he expressed affection for Julia and concern for her welfare; that Julia had arranged for blood transfusions for him, and two of her friends gave their blood therefor.

On the morning of November 22nd, Julia Comino was advised by telephone by the hospital authorities that Charles had taken a turn for the worse and to come at once. She immediately called on Mrs. Rapida, an old friend of herself and husband to accompany her. When Julia Comino arrived at Mrs. Rapida's the latter pursuing an inquiry of some days before asked Julia if she had called an attorney about a will or had taken any such steps or intended doing so, to which Julia responded, ''No.'' Thereupon Mrs. Rapida using a form which she had in her home hastily wrote out a last will and she and Julia left for the hospital. In the hospital ward after the usual greetings Mrs. Rapida asked Charles to whom he wanted to leave his property, to which he replied, ''To my wife—she's been very good to me.'' Mrs. Rapida then read the will that she had written to which Charles remarked, ''That's fine.'' Mrs. Rapida then suggested that she phone for a lawyer to prepare a formal will to the same effect as the one she had written, which suggestion Charles Comino approved. She then telephoned to Mr. Wensinger Mahoney, a lawyer and night school instructor of Julia Comino's. At the same time, at Julia's request, she telephoned to Charles' relatives asking them to come to the hospital immediately; and with Charles' approval she telephoned for a priest. After Mahoney's arrival at the hospital and a short conversation with Charles Comino he inquired concerning to whom he desired to leave his property, to which Charles replied, ''To my wife.'' Mahoney then asked him if he had read the will prepared by Mrs. Rapida to which he replied that he had and that he approved of its terms. Mahoney thereupon fully explained the effect of the will and Charles stated that that was what he wanted. Mahoney advised that the will as written was sufficient and properly drawn and need only be signed by him to be effective. At Comino's request the bed was raised so as to permit him to sign but upon being raised up he complained that ''He saw three lines.'' Finally, after endeavoring to do so, he said he could not write and Mahoney stated that if he cared to do so that he could make his mark as a signature, to which Charles Comino replied that he did. Thereupon he made

his mark, and the same was witnessed by Mahoney and Mrs. Rapida.

The will contest was tried before the court sitting without a jury, a jury trial having been waived by the parties; and at the conclusion thereof the trial court made and filed an opinion and order for findings, in which it fully reviewed the evidence. By stipulation of the parties said opinion and order have been presented to this court in a supplemental brief filed by respondent. After the filing of its order aforesaid, the court made findings to the effect that the will of Comino was executed and published in the manner and form required by law, that at the time of its execution decedent was in all respects competent to make testamentary disposition of his property, that in the preparation, making and witnessing of his will, he was not acting under the undue inflence of Julia Comino or any other person; and that the execution and publishing of said will was his free and voluntary act and deed. Judgment and order admitting the will to probate followed.

We are of the opinion that the evidence is quite sufficient to sustain the findings. ▮ Appellants state that the questions involved on this appeal are: ''Where a proponent of a will is not related to the decedent, and actually participates in the execution of a will by the decedent wherein all of his property is left to the proponent to the practical exclusion of his relatives who otherwise would be entitled to inherit such property, is not the burden of proof upon the proponent in a contest of the will, to show that there was, in fact, no undue influence exercised by her in the making of such will? If the foregoing questions be answered in the affirmative, is it not true in this case that such proponent did have such burden of proof, and that she failed to sustain it?''

No reference is made in either of appellants' briefs to the findings of the trial court, and no attack is made upon said findings unless it be assumed, from the second question of appellants above set forth, that they contend that the evidence is insufficient to sustain same.

On appeal all intendments are in favor of a judgment, and the burden is upon appellants to show that, taking the evidence in its most favorable aspect, and disregarding conflicting evidence, it is insufficient to support the findings and judgment of the trial court. (*Raggio* v. *Mallory*, 10 Cal.2d 723, 725 [76 P.2d 660]; *Douillard* v. *Woodd*, 20 Cal.2d 665, 668

[128 P.2d 6]; *Wright* v. *Sellers*, 25 Cal.App.2d 603, 604 [78 P.2d 209]; *Holwick* v. *Walker*, 6 Cal.App.2d 669, 672 [45 P.2d 374].)

Assuming that the first question propounded by appellants is a correct statement of the law, though we do not agree that it is (*Estate of Shay*, 196 Cal. 355 [237 P. 1079]; *Estate of Relph*, 192 Cal. 451 [221 P. 361]; *Estate of Graves*, 202 Cal. 258 [259 P. 935]), in the opinion and order for findings in this case the court stated: ''Even if it be assumed that the burden was legally cast upon Contestee herein to establish that the Will was not the product of her undue influence (*Estate of Graves, supra,* 262; *Estate of Hampton,* 39 Cal.App.2d 488, 497 [103 P.2d 611], a thorough consideration of the evidence convinces that such burden has been fully discharged.''

It is said in *Estate of Presho,* 196 Cal. 639, 643 [238 P. 944]:

''As to the sufficiency of the evidence, if from all the evidence the verdict is based on material facts legally proved or on inferences which may be reasonably drawn from those facts, even though there be an honest difference of opinion as to the effect of the evidence, the verdict will be deemed supported. (*Field* v. *Shorb,* 99 Cal. 661, 666 [34 P. 504]; *Ryder* v. *Bamberger,* 172 Cal. 791 [158 P. 753]; *Hind* v. *Oriental Products Co.,* 195 Cal. 655 [235 P. 438]; 2 Cal.Jur. 879, and cases cited.)''

Regarding what constitutes undue influence the court said, in *Estate of Arnold,* 16 Cal.2d 573, 577 [107 P.2d 25], cited by appellants in this case:

''In an action to set aside a will of a deceased person on the ground of undue influence, it is necessary to show that the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will. (*Estate of Motz,* 136 Cal. 558, 583 [69 P. 294].) Evidence must be produced that pressure was brought to bear directly upon the testamentary act. (*In re McDevitt,* 95 Cal. 17, 33 [30 P. 101].) Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will, and must amount to *coercion* destroying free agency on the part of the testator. (*Estate of Keegan,* 139 Cal. 123, 127 [72 P. 828].) It is further held that mere opportunity to influence the mind of the testator, even coupled with an

interest or a motive to do so, is not sufficient. (*Estate of Easton*, 140 Cal.App. 367, 371 [35 P.2d 614].)

" 'The unbroken rule in this state is that courts must refuse to set aside the solemnly executed will of a deceased person upon the ground of undue influence unless there be proof of "a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made".' (*Estate of Gleason*, 164 Cal. 756, 765 [130 P. 872].)"

In that case a nonsuit was granted in favor of one of the proponents of the will, and it was contended on appeal that a case had been made sufficient to put said proponent to her proof that there was no exercise of undue influence. But the court there said that even assuming that a confidential relationship between this beneficiary and the testator had been established, that the testimony of contestant failed to show any activity on the part of the beneficiary in the procurement of the will; and the nonsuit was sustained.

Appellants also cite *Estate of De Graaf*, 34 Cal.App.2d 120 [93 P.2d 199]. There the court stated that a presumption of undue influence arises when it appears that one who *unduly profits by a will* sustains a confidential relationship and actively participates in procuring the execution of the will; and that when this presumption arises the burden of proof rests upon proponent to overcome the presumption. But it also held that, assuming that the presumption arose in the case, whether or not it was dispelled by evidence was a question of fact for the trial court and that there was evidence to sustain its findings.

But in the case before us contestants are urging, not that the presumption arises because it has been shown that Mrs. Comino actively participated in procuring the execution of the will, but that the burden is on her to show that she had not so participated, for they say in their brief that Mrs. Comino did not sustain this burden because "she gave no testimony whatsoever concerning what she may have said or done to Comino to induce him to make a will in her favor"; that "she did not even testify to circumstances attendant upon the making of the alleged will."

But when a proponent of a will has proved due execution of the instrument the duty then devolves upon a contestant to make a showing in support of his allegations of incompetency and undue influence; and to that extent he has the

burden of proof. (26 Cal.Jur. 759.) Here the evidence does not show that decedent was incompetent, or that at the time the will was executed the testator's free agency was destroyed and another person's will substituted.

 A contestant, in order to establish undue influence, must present evidence showing that pressure was brought to bear directly upon the testamentary act, and at the very time the will was made. (*Estate of Perkins,* 195 Cal. 699 [235 P. 45]; *Estate of Holloway,* 195 Cal. 711 [235 P. 1012]; *Estate of Bryson,* 191 Cal. 521 [217 P. 525].) The only evidence tending to show any participation of Julia Comino in the making of the will was the testimony of Mrs. Rapida, produced by proponents, that she (Mrs. Rapida) drew up the draft of the will before going to the hospital because Mrs. Comino told her that Mr. Comino was leaving everything to her; but this is insufficient to raise an inference of undue influence.

In *Estate of Donovan,* 140 Cal. 390 [73 P. 1081], it was said that it cannot be presumed, because a wife has ample opportunity and inducement to exert undue influence over her husband, that she has done so; it must be shown that she has exerted her influence for an improper purpose.

And in *Estate of Kilborn,* 162 Cal. 4, 11 [120 P. 762], it was held that mere proof of opportunity to influence a testator's mind, even when coupled with an interest or motive to do so, will not sustain a finding of undue influence, in the absence of testimony showing that there was pressure operating directly upon the testamentary act.

 Also it does not appear that Julia Comino unduly profited by the will. The estate was small and she was the natural object of testator's bounty, and the contestants were not. An instrument is not to be considered as unnatural where it provides for a wife to the exclusion of brothers or sisters. (*Estate of Jacobs,* 24 Cal.App.2d 649, 652 [76 P.2d 128]; 26 Cal. Jur. 695, 696.) And whether decedent and Julia Comino were legally married is unimportant, since decedent believed Julia to be his wife. It is the apparent rather than the legal relationship of the parties that is significant.

In *Estate of Morcel,* 162 Cal. 188 [121 P. 733], the appeal was from a judgment refusing to admit a purported will to probate. It was contested on the ground of undue influence on the part of Morcel who had lived with decedent in the relationship of husband and wife though they were unmarried.

A jury found for contestant but the Supreme Court reversed the judgment on the ground that the exercise of undue influence was unsupported by the evidence. The court said that the burden was on *contestant* to show facts from which an inference of undue influence on the part of Morcel, beneficiary under the will, could be drawn; and that the kind of influence warranting a repudiation of the will must be such as in effect destroyed the testator's free agency, and substituted for his own another person's will; that a mere suspicion that undue influence may have been used is not sufficient; that there must be proof of a pressure which overpowered the volition of the testator at the time the will was made; also that the fact that the parties were not legally married did not make the will unnatural or unreasonable.

*Estate of Relph, supra,* is relied upon by appellants, but there the court said, page 465:

"Contestants, in reply, invoke the rule that 'where one who unduly profits by the will as a beneficiary thereunder sustains a confidential relation to the testator, and has actually participated in procuring the execution of the will, the burden is on him to show that the will was not induced by coercion or fraud.' (*Estate of Baird,* 176 Cal. 381, 384 [168 P. 561]; *Estate of Nutt,* 181 Cal. 522, 528 [185 P. 393]), and that 'a presumption of undue influence arises from proof of the existence of a confidential relation between the testator and such a beneficiary, coupled with activity on the part of the latter in the preparation of the will.' (*Estate of Higgins,* 156 Cal. 261 [104 P. 6].) The rule is well recognized, but is not applicable to the facts herein. Miss Blackwell, the beneficiary, not only was not shown to have been active in the preparation of the will, but was not shown to have participated in any way in procuring its execution."

Likewise in the instant case, Mrs. Comino was not shown to have been active in procuring the execution of the will, nor was it shown that any undue influence was exerted upon the testator.

The judgment is affirmed.

Schottky, J. pro tem., and Thompson, J., concurred.